UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| BOBBY STONE,<br><br>   Plaintiff,<br><br>v.<br><br>ASSOCIATED WHOLESALE GROCERS, INC.,<br><br>   Defendant. | Case No. 3:24-cv-00812<br><br>Judge Waverly D. Crenshaw, Jr.<br>Magistrate Judge Alistair E. Newbern |

To:   The Honorable Waverly D. Crenshaw, Jr., District Judge

## REPORT AND RECOMMENDATION

This action arises out of pro se Plaintiff Bobby Stone's employment with Defendant Associated Wholesale Grocers, Inc. (AWG). (Doc. No. 1-1.) Stone filed a complaint against AWG in state court asserting a retaliatory discharge claim under the Tennessee Public Protection Act (TPPA), Tenn. Code Ann. § 50-1-304. (*Id.*) AWG removed the action to this Court (Doc. No. 1), answered Stone's complaint (Doc. No. 6), and filed a motion for summary judgment on Stone's TPPA claim (Doc. No. 16). Stone has responded in opposition to AWG's motion for summary judgment. (Doc. Nos. 21, 22.)

The Court referred this action to the Magistrate Judge to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 8.) Having considered the parties' arguments and the summary judgment record as a whole, and for the reasons that follow, the Magistrate Judge will recommend that the Court deny AWG's motion.

## I. Background

### A. Factual Background[1]

AWG is a grocery wholesaler that owns and operates warehouses across the United States, including a warehouse in Nashville, Tennessee. (Doc. No. 19-1.) The Nashville warehouse is divided into a refrigerated section for perishable groceries and a non-refrigerated section for all other groceries. (*Id.*) The two sides of the warehouse are separated by an automatic door. (*Id.*) The warehouse operates on two shifts, shipping and receiving. (*Id.*) During each shift, approximately twenty-four forklift operators move products in and out of the warehouse. (*Id.*)

AWG hired Stone to work in the Nashville warehouse in August 2007. (Doc. No. 20-1.) Stone started as a selector, a job that involved manually moving cases of grocery products. (*Id.*) In 2014, Stone became a forklift driver and worked the shipping shift on the refrigerated side of the warehouse. (*Id.*; Doc. No. 19-1.) Specifically, Stone worked in replenishment and moved product from reserve shelving to be picked for shipping. (Doc. No. 19-1.)

Stone "made near daily reports about perceived problems with his [ ] forklift." (Doc. No. 19-2, PageID# 129, ¶ 5.) The parties dispute what number of Stone's complaints were well-founded and whether and how quickly any necessary forklift repairs were made. (Doc. Nos. 19-2, 20-1, 22.) The parties also dispute whether Stone attempted to perform maintenance or alterations on the forklifts himself, which would have been contrary to AWG policy. (Doc. Nos. 19-2, 20-1, 22.)

AWG asserts that Stone received a "final warning from AWG" in February 2023 "for tampering with the mechanical components of forklift equipment." (Doc. No. 18, PageID# 118,

---

[1] The facts in this section are drawn from the parties' summary judgment materials (Doc. Nos. 18, 19-1, 19-2, 20-1, 21, 22) and are undisputed unless otherwise indicated.

¶ 1.) Stone disputes that he tampered with the forklift (Doc. No. 20-1) and asserts that the final warning was "not a valid write up" (Doc. No. 21, PageID# 294, ¶ 1). AWG asserts that Stone "received another final warning from AWG in June 2023 for changing a forklift battery with a remaining charge of 35%, contrary to AWG's practice of waiting to do so until there was a remaining charge of 20% . . . ." (Doc. No. 18, PageID# 118, ¶ 2.) Stone disputes that it was against company practice to charge a forklift battery with a remaining charge of thirty-five percent and asserts that some forklifts would stop working if allowed to drain to twenty percent battery charge. (Doc. Nos. 20-1, 21, 22.)

In 2022 and 2023, Stone made complaints to the Tennessee Occupational Safety and Health Administration (TOSHA) about safety and health hazards at AWG. (Doc. No. 20-1.) TOSHA acknowledged receipt of Stone's complaints in letters dated March 18, 2022, and February 7, 2023. (*Id.*) In the letters, TOSHA stated that it had "notified [an] [AWG] representative requesting that the appropriate action be taken to correct the situation." (*Id.* at PageID# 291, 293.) TOSHA stated that it had "not revealed [Stone's] identity to [AWG]." (*Id.*) However, TOSHA informed Stone that "state law d[id] not protect [his] name from being revealed unless [he] specifically request[ed] that it not be revealed" and prompted Stone to "let [TOSHA] know that fact as soon as possible" "[i]f [he] ha[d] not already" done so. (*Id.*)

On July 27, 2023, Stone reported a spill on the warehouse floor to his supervisor Andre Smith. (Doc. Nos. 19-1, 20-1.) Smith called the sanitation department and asked it to send someone to clean up the spill. (*Id.*) Stone states that "someone came through on the mop machine [and] made a bigger mess with soap on the floor." (Doc. No. 22, PageID# 310, ¶ 32.) When Smith "check[ed] on the cleanliness of the warehouse" "[a]bout an hour or so later[,]" the area where Stone was working "was still slippery[.]" (Doc. No. 20-1, PageID# 277.)

3

There is no dispute that, on the same date, Stone pressed the emergency stop or "E-Stop" button to disable the automatic door separating the refrigerated and non-refrigerated sides of the warehouse. (Doc. Nos. 18, 19-1, 20-1, 22.) Stone states that he left the door open "for a couple hours for the floor to dry up, and then [he] closed it as instructed before [he] left." (Doc. No. 20-1, PageID# 160.) Stone also states that Smith gave him permission to leave the door open. (Doc. No. 20-1.) AWG asserts that, contrary to Stone's statements, the door remained open until at least 6:00 a.m. on the following day. (Doc. Nos. 18, 19-2.) AWG Nashville warehouse manager Lloyd Faircloth states that Stone "did not receive authorization" to press the E-Stop button. (Doc. No. 19-1, PageID# 126, ¶ 34.)

AWG terminated Stone's employment on or about July 31, 2023. (Doc. Nos. 18, 19-1, 20-1.) AWG asserts that it terminated Stone's employment "in [ ] light of [his] actions on July 27, 2023, as well as his two final warnings in the previous six months." (Doc. No. 18, PageID# 119, ¶ 5.) AWG states that, when it made the decision to terminate Stone's employment, it was "unaware that [Stone] had previously made any complaints to [TOSHA]." (*Id.* at PageID# 120, ¶ 6.) Stone states that AWG terminated his employment because he had showed his manager Eric Walls an email response that Stone received from TOSHA. (Doc. Nos. 20-1, 21.) Stone also states that he was discharged because of his race and age. (Doc. Nos. 20-1, 21.)

B.  **Procedural History**

Stone filed a pro se complaint against AWG in the Circuit Court for Davidson County, Tennessee, on May 24, 2024. (Doc. No. 1-1.) Stone's complaint asserts that AWG violated the TPPA by terminating his employment in retaliation for his communications with TOSHA. (*Id.*) Stone seeks back pay, front pay, compensatory damages, and reinstatement. (*Id.*)

AWG removed the action to this Court on July 3, 2024, and filed an answer to Stone's complaint one week later. (Doc. Nos. 1, 6.) The Court referred this action to the Magistrate Judge

4

to dispose or recommend disposition of any pretrial motions under 28 U.S.C. § 636(b)(1)(A) and (B). (Doc. No. 8.)

On March 20, 2025, AWG filed a motion for summary judgment (Doc. No. 16) supported by a memorandum of law (Doc. No. 17), a statement of undisputed material facts (Doc. No. 18), declarations by Faircloth (Doc. No. 19-1) and AWG Nashville warehouse facilities maintenance manager Kendell Roberts (Doc. No. 19-2), and the transcript of Stone's deposition with exhibits (Doc. No. 20-1). Stone filed a response to AWG's statement of undisputed material facts (Doc. No. 21) and a response to Faircloth's and Roberts's declarations (Doc. No. 22). AWG did not file an optional reply in support of its motion for summary judgment.

**II.     Legal Standard**

In resolving a motion for summary judgment, the Court must undertake "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Under Federal Rule of Civil Procedure 56, a court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law[,]" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of demonstrating that no genuine issues of material fact exist. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party meets its burden, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (citation omitted); *see also Blizzard v. Marion Tech. Coll.*, 698

F.3d 275, 282 (6th Cir. 2012) ("Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))). The parties "must support" their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or, alternatively, by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)–(B). Courts must view the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). However, if the moving party carries its initial burden, the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position. *Anderson*, 477 U.S. at 252. In order to proceed to trial, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.*

**III.      Analysis**

    **A.      AWG's Initial Burden Under Federal Rule of Civil Procedure 56**

"Rule 56 first imposes a burden of production on the moving party to make a prima facie showing that it is entitled to summary judgment." 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2727.1 (4th ed. suppl. Sep. 2025). "In this context, a 'prima facie' showing means that, in the absence of evidence to the contrary, the movant's evidence is sufficient to entitle the movant to summary judgment." 11 James Wm. Moore et al., *Moore's Federal Practice* § 56.40[1][a] (2025). Courts must view the movant's evidence in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) ("[T]he

moving party . . . ha[s] the burden of showing the absence of a genuine issue as to any material fact, and for these purposes the material it lodged must be viewed in the light most favorable to the opposing party."). If the moving party's evidence is insufficient, "'[n]o defense . . . is required'" and summary judgment must be denied. *Id.* at 161 (quoting 6 James Wm. Moore et al., *Moore's Federal Practice* § 56.22(2) (2d ed. 1966)); *see also* 10A Wright & Miller, *Federal Practice and Procedure* § 2727.1 ("[I]f the movant bears the burden of proof on a claim at trial . . . [and] fails to make that initial showing, the court must deny the motion, even if the opposing party has not introduced contradictory evidence in response.").

The Court must therefore examine the evidence that AWG offers in support of its motion to determine if it is sufficient to satisfy AWG's initial summary judgment burden with respect to each element of Stone's TPPA claim before evaluating Stone's response in opposition. *See Adickes*, 398 U.S. at 160 ("'[W]here the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented.'" (quoting Fed. R. Civ. P. 56 advisory committee's note to 1963 amendment)). Rule 56(c)(3) provides that the Court "need consider only" materials cited by the parties in their summary judgment briefing, "but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3); *see also* Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment ("[A] court may consider record materials not called to its attention by the parties.").

### B. Stone's TPPA Claim

The TPPA, Tennessee's whistleblower statute, was enacted in 1990 to give "statutory protection to employees whose actions served to deter, expose, and stop organizational wrongdoing." *Williams v. City of Burns*, 465 S.W.3d 96, 109–10 (Tenn. 2015). The statute provides that "[n]o employee shall be discharged or terminated solely for refusing to participate in, or for refusing to remain silent about, illegal activities[,]" Tenn. Code Ann. § 50-1-304(b), and

7

it creates a private right of action for any employee terminated in violation of this provision, *id.* § 50-1-304(c)(1). "Illegal activities" include "activities that are in violation of the criminal or civil code of [Tennessee] or the United States or any regulation intended to protect the public health, safety, or welfare[.]" *Id.* § 50-1-304(a)(3)(A). There are four elements of a retaliation claim under the TPPA:

> (1) the plaintiff was an employee of the defendant;
>
> (2) the plaintiff refused to participate in or remain silent about illegal activity;
>
> (3) the defendant employer discharged or terminated the plaintiff's employment; and
>
> (4) the defendant terminated the plaintiff's employment solely for the plaintiff's refusal to participate in or remain silent about the illegal activity.

*Williams*, 465 S.W.3d at 111 (quoting *Sykes v. Chattanooga Hous. Auth.*, 343 S.W.3d 18, 27 (Tenn. 2011)).

At summary judgment and trial, courts apply a modified version of the burden-shifting framework articulated by the Supreme Court in *McDonnell Dougals Corp. v. Green*, 411, U.S. 792 (1973), and in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 257–58 (1981), to TPPA claims. *See Gammons v. Adroit Med. Sys., Inc.*, 91 F.4th 820, 829 (6th Cir. 2024) (citing *Williams*, 465 S.W.3d at 111–12); *see also* Tenn. Code Ann. § 50-1-304(f) (setting forth "allocations of burdens of proof" that "shall apply" "[i]n any civil cause of action for retaliatory discharge brought pursuant to this section"). Notably, "the TPPA is more stringent than *McDonnell Douglas* because it requires the plaintiff to show that unlawful retaliation was the sole reason for the termination." *Gammons*, 91 F.4th at 829 (citing *Williams*, 465 S.W.3d at 110–11). Under the applicable framework,

> if an employee proves a prima facie case of . . . retaliation, the employee creates a rebuttable presumption that the employer unlawfully . . . retaliated against him or her. The burden of production shifts to the employer to articulate a legitimate and

> . . . nonretaliatory reason for the action. If the employer satisfies its burden, the presumption of . . . retaliation "drops from the case," which sets the stage for the factfinder to decide whether the adverse employment action was . . . retaliatory. The employee, however, "must . . . have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the [employer] were not its true reasons, but were a pretext for [retaliation]."

*Williams*, 465 S.W.3d at 112–13 (alterations in original) (quoting *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 780–81 (Tenn. 2010), *superseded by statute*, 2011 Tenn. Pub. Acts ch. 461 § 2, *as recognized in*, *Williams*, 465 S.W.3d at 112 n.15). To establish a prima facie case of retaliation under the TPPA, the employee "must demonstrate that he engaged in conduct protected by the TPPA, that the protected conduct was known to the defendant, that the defendant thereafter discharged him, and that there was the requisite causal connection between the protected conduct and the discharge." *Williams*, 465 S.W.3d at 113. The employee bears "the ultimate burden of persuading the trier of fact that the employer engaged in unlawful retaliation . . . ." *Id.*

AWG's brief in support of its motion for summary judgment does not address the specific burden-shifting legal standard applicable to Stone's TPPA claim at summary judgment. *See Poltec, Inc. v. Willingham*, Case No. 3:20-cv-1049, 2023 WL 2749153, at *6 (M.D. Tenn. Mar. 31 2023) (citing *Robinson v. Shelby Cnty.*, Civ. No. 3:17-cv-00097, 2020 WL 1170218, at *9 (E.D. Ky. Mar. 11, 2020), for the proposition "that defendants fail[ ] to meet their [initial] burden on summary judgment when they [do] not cite or apply the standards applicable to [plaintiffs'] claims"). AWG argues generally that Stone cannot prove that he engaged in protected conducted under the TPPA, that AWG knew about the protected conduct when it terminated his employment, and that Stone's protected conduct was AWG's sole reason for terminating his employment. (Doc. No. 17.) But AWG has not analyzed the relevant factual and legal issues in the context of the specific modified burden-shifting analysis that the Court must apply to Stone's TPPA claim. *See Pewitte v. Hiniger*, Case No. 3:17-cv-00822, 2020 WL 2218754, at *18 (M.D. Tenn. May 6, 2020)

(recommending denying motion for summary judgment where "defendants ha[d] not addressed the specific legal standards governing" plaintiff's claims and "ha[d] not analyzed the relevant factual and legal issues specific to [plaintiff's] particular claims"), *report and recommendation adopted sub nom. Pewitte v. Pratt*, 2020 WL 5105404 (M.D. Tenn. Aug. 31, 2020); *Woodby v. Bradley Cnty.*, No. 1:07-cv-3, 2008 WL 5245361, at *13 (E.D. Tenn. Dec. 16, 2008) (finding that defendants "failed to meet their initial burden of establishing an absence of a dispute of material fact" and denying in part motion for summary judgment where defendants did "not set forth the applicable legal standards and . . . failed to analyze the relevant issues"). Instead, AWG has "le[ft] it to the court to seek out the relevant law, identify the relevant evidence, and develop their argument for them." *Brenay v. Schartow*, 709 F. App'x 331, 336 (6th Cir. 2017). "But ours is an adversarial system in which 'it is improper for the courts' to 'flesh out the parties' arguments for them.'" *ECIMOS, LLC v. Nortek Glob. HVAC, LLC*, 736 F. App'x 577, 585 (6th Cir. 2018) (citing *Brenay*, 709 F. App'x at 337). "[I]t is not for the court to search the record and construct arguments. Parties must do that for themselves." *Brenay*, 709 F. App'x at 337.

Further, having reviewed AWG's evidence and the parties' arguments, the Court finds that questions of material fact remain as to at least the following issues: (1) whether Stone engaged in protected conduct under the TPPA; (2) whether AWG knew that Stone had complained to TOSHA when AWG terminated Stone's employment; (3) whether retaliation was the sole reason for AWG's termination of Stone's employment; and (4) whether AWG's asserted nonretaliatory reasons for terminating Stone's employment are pretextual.

"To demonstrate protected activity for purposes of a [TPPA] whistleblowing claim, a plaintiff must show that she 'reported the employer's illegal activity and that the "reporting of the illegal activity furthered a clear public policy."'" *Lehr v. Tapestry, Inc.*, Case No. 3:23-cv-00675,

2025 WL 1463164, at *5 (M.D. Tenn. May 2, 2025) (quoting *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 37 (Tenn. 2015)), *report and recommendation adopted*, 2025 WL 1463156 (M.D. Tenn. May 21, 2025). Tennessee courts have "accepted the violation of [ ] OSHA regulation[s] as a matter of sufficient public policy concern to constitute an illegal activity under the TPPA." *Davis v. Vanderbilt Univ. Med. Ctr.*, No. M2019-01860-COA-R3-CV, 2020 WL 4516094, at *7 (Tenn. Ct. App. Aug. 5, 2020) (discussing *Mason v. Seaton*, 942 S.W.2d 470, 471 (Tenn. 1997)); *see also id.* (holding that "workplace safety . . . appears to be a matter of public concern in the State of Tennessee"). There is no dispute that Stone filed reports with TOSHA about health and safety violations at AWG prior to AWG's termination of his employment. (Doc. No. 20-1.) The record evidence, construed in the light most favorable to Stone, demonstrates that TOSHA acted on Stone's complaints by sending AWG letters "requesting that the appropriate action be taken to correct" at least some of the "items" and "conditions" that Stone reported. (*Id.* at PageID# 291, 293.)

As to AWG's knowledge of Stone's communications with TOSHA, AWG cites Faircloth's declaration and Stone's deposition in support of its assertion that it was "unaware that [Stone] had previously made any complaints to [TOSHA]" "[w]hen AWG made the decision to terminate [Stone's] employment[.]" (Doc. No. 18, PageID# 120, ¶ 6 (citing Doc. Nos. 19-1, 20-1).) But Faircloth's declaration states only that TOSHA did not share Stone's identity with AWG. (Doc. No. 19-1, PageID# 127, ¶ 38 ("At no time during [Stone's] employment did TOSHA indicate the complainant of any complaints submitted regarding AWG.").) Similarly, Stone's deposition testimony merely confirms that TOSHA's March 18, 2022, and February 7, 2023 letters to him stated that TOSHA had not revealed Stone's identity to AWG. (Doc. No. 20-1, PageID# 208.) On the other hand, the record contains evidence that Stone himself told AWG officials that TOSHA

had been in contact with him about equipment issues prior to the termination of his employment. One of the exhibits that AWG filed with Stone's deposition transcript is an email from Walls to Faircloth and other AWG officials in which Walls describes an interaction he had with Stone on February 8, 2023, the day after the date of TOSHA's second letter to Stone. (Doc. No. 20-1.) Walls stated that:

> [Stone] told [Walls] that he wanted to let [Walls] know that OSHA emailed [Stone] about some equipment problems. [Stone] said that he ha[d] no idea why they emailed him because he ha[d] not contacted them at all about anything. [Stone] also said that he was fairly sure that it wasn't his wife that emailed them and went on to say that he felt like it was sent by someone that has access to his Oracle account. [Stone] had his email open on his phone trying to show [Walls] that OSHA emailed him to confirm what he was trying to let [Walls] know. [Walls] told [Stone] that [he] appreciated the info but that was not what [Walls] wanted to talk to [Stone] about.

(*Id.* at PageID# 244.) The record also contains a July 26, 2023 email from AWG senior human resources official Chris Kimbrough to other AWG officials listing reasons that "management" was "request[ing]" "[t]ermination" of Stone's employment, including that, on July 21, 2023, Stone "threatened to call OSHA if maintenance did not make a[ ] . . . change to his forklift that he requested." (*Id.* at PageID#273.) Kimbrough stated that "[t]he issue" with Stone's threat was "not that [Stone] would contact OSHA, but that he [was] threatening to lie and abuse a government agency for an issue that [was] not related to his safety." (*Id.*)

AWG argues that retaliation could not be its sole reason for terminating Stone's employment because Stone "had a pattern of performance issues and insubordination that cumulated in 2023 with two final warnings and serious safety violations, leaving AWG with no other choice but to terminate his employment for those legitimate reasons[.]" (Doc. No. 17, PageID# 114.) But the record contains conflicting evidence about AWG's workplace policies and practices and Stone's adherence to them. (Doc. Nos. 19-1, 19-2, 20-1.) And there is direct evidence that AWG considered Stone's purported threat to call TOSHA when deciding to terminate his

employment the day before Stone reported the spill and pressed the E-stop button. (Doc. No. 20-1.) Accordingly, the record also demonstrates an issue of fact as to whether AWG's asserted reason for terminating Stone's employment was pretext for retaliation.

AWG therefore has not carried its initial burden to demonstrate the absence of any genuine disputes of material fact regarding Stone's TPPA retaliation claim. *Cf. Holton v. Peerbolte*, No. 3:22-cv-00559, 2024 WL 2868229, at *2 (M.D. Tenn. June 6, 2024) (denying motion for summary judgment where defendants failed to meet their initial summary judgment burden).

**IV.     Recommendation**

For these reasons, the Magistrate Judge RECOMMENDS that AWG's motion for summary judgment (Doc. No. 16) be DENIED.

Any party has fourteen days after being served with this Report and Recommendation to file specific written objections. Failure to file specific objections within fourteen days of receipt of this Report and Recommendation can constitute a waiver of appeal of the matters decided. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004). A party who opposes any objections that are filed may file a response within fourteen days after being served with the objections. Fed. R. Civ. P. 72(b)(2).

Entered this 5th day of November, 2025.

_____
ALISTAIR E. NEWBERN
United States Magistrate Judge